**GENOVA BURNS LLC**
Harris S. Freier, Esq. (NJ Bar #013412006)
HFreier@genovaburns.com
494 Broad Street
Newark, New Jersey 07102
Telephone: (973) 533-0777
Facsimile: (973) 533-1112
*Attorneys for Plaintiff, ADP, Inc.*

**MCDONALD HOPKINS PLC**
Timothy J. Lowe, Esq. (MI Bar # P68669)
tlowe@mcdonaldhopkins.com
39533 Woodward Avenue, Suite 318
Bloomfield Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-7075
*Co-Counsel for Plaintiff, ADP, Inc.*
(To Be Admitted *Pro Hac Vice*)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADP, INC., | : |
| | : |
| Plaintiff, | : DOCKET NO: |
| | : |
| v. | : |
| | : |
| MATTHEW LEVIN, | : |
| | : |
| Defendant. | : |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff ADP, Inc. ("ADP"), for its Complaint for Injunctive and Other Relief

against Defendant Matthew Levin ("Levin"), states as follows:

{9570119:7 }

## INTRODUCTION

1.      ADP was forced to file this action because Matthew Levin, ADP's former Chief Strategy Officer ("CSO"), has resigned his position to take employment with an ADP competitor, Benefitfocus, Inc. ("Benefitfocus"), as its chief executive officer ("CEO").  Levin's role as CSO uniquely positions him to unfairly compete against ADP, both in benefits administration and other segments in which Benefitfocus may plan to grow.

2.      Despite its best efforts, ADP has not yet confirmed whether Levin has actually accepted the Benefitfocus CEO position, but it is clear that is his intent, and his conduct is or would be a breach of his obligations with ADP contained in his Restrictive Covenant Agreements ("RCAs") (attached, respectively, at **Exhibit A**), in which he agreed to not take a similar position with a competitor of ADP, like Benefitfocus.

## THE PARTIES

3.      ADP is a Delaware corporation with its principal place of business in Roseland, New Jersey.

4.      Upon information and belief, Levin has residences in Chicago, Illinois and Union Pier, Michigan.

## JURISDICTION AND VENUE

5.     This Court has personal jurisdiction over Levin because Levin specifically agreed in multiple RCAs with ADP that any action by ADP to enforce the RCAs, or any litigation related to that agreement, may be brought in the State or Federal Courts located in the State of New Jersey.  Levin further agreed and consented to the personal jurisdiction of and venue in the state and federal courts of New Jersey for resolution of any litigation arising under or in connection with that agreement.

6.     Subject matter jurisdiction is appropriate in this matter pursuant to 28 U.S.C. § 1332(a)(1).  ADP is a Delaware corporation, with its principal place of business in Roseland, New Jersey.  For jurisdictional purposes ADP is a citizen of both New Jersey and Delaware.  Levin is a citizen of Illinois and/or Michigan.  The matter in controversy exceeds the sum or value of $75,000.

7.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises out of the violation of a federal law, the Defend Trade Secrets Act, 18 U.S.C. §§ 1831, *et seq*.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Levin is subject to personal jurisdiction in this District, a substantial part of the events giving rise to the claims in this action occurred in this District, ADP has its

headquarters in this District, and the harm caused by Defendant's actions is and will be suffered in this District.

## FACTUAL BACKGROUND AND COMMON ALLEGATIONS

9.    For over seventy years, ADP has provided business outsourcing and software services to clients, including human resources, payroll, tax, and benefits administration services.   ADP offers its services across the United States and globally.

10.    ADP's success in the industry is largely attributable to its confidential, trade secret, and proprietary information regarding, among other things, its enterprise strategy, proprietary products, software, services, techniques, strategic business plans, client and prospect lists, client preferences, pricing and contract details, operational procedures, marketing and sales strategies, and referral sources. ADP has invested significant time, money, and resources to generate, develop, and maintain its confidential, trade secret, and proprietary information.

11.    Information about ADP's enterprise strategy, business plans, and marketing and sales strategies are not publicly available or generally known or discoverable without significant efforts.   ADP provides information concerning its enterprise strategy, business plans, and marketing and sales strategies to its employees on a need to know basis with the clear understanding that such information is proprietary and must be kept confidential.

## **Levin's Employment with ADP**

12.     Levin served as ADP's CSO from on or about November 12, 2018 until April 28, 2021.

13.     At ADP, Levin reported directly to ADP's CEO.

14.     As CSO, Levin sat on the ADP executive committee.  The executive committee is comprised of ADP's CEO and the most senior leaders of ADP's different business units, including sales, product development, legal, finance, and strategy.  During executive committee meetings, business leaders discuss issues and make decisions regarding ADP's business as a whole. ADP's most sensitive strategy decisions, including how ADP executes on this strategy and competes in the market, are discussed in detail during these meetings.

15.     Historically, ADP's executive committee members met with ADP's CEO once a month.  At the outset of the Covid-19 pandemic, however, the executive leaders began meeting daily with ADP's CEO to discuss ADP's enterprise-wide strategic plan.  During these meetings, Levin would provide insight to ADP's CEO and other executive committee members concerning ADP's pandemic and post-pandemic business enterprise plan and strategy.   As the Covid-19 pandemic progressed, these meetings were held every other day and later once a week.

16.     As CSO, Levin was responsible for shaping the visions and direction for ADP's overall strategy.  Levin worked with all of ADP's business units globally

and had individuals on his team that were embedded with those business units, and its leaders, including benefits administration.  Levin was responsible for setting short-term, mid-term, and long-term goals for ADP.  Levin met with the heads of each operating unit, including sales, competitive intelligence, and product development, to understand not only the business unit's strengths and weaknesses, but also the strengths of weaknesses of ADP's competitors and the interplay between them.

17.     Levin led efforts to assess, re-define, and achieve the goals of ADP's enterprise strategy and partnered with ADP's CEO and executive committee to communicate ADP's enterprise strategy throughout the organization.  Levin was one of the few executive committee leaders with as much insight into ADP's short-term, mid-term, and long-term strategy planning as ADP's CEO.

18.     Levin also ensured ADP's enterprise strategy positively influenced the trajectory of the company's performance by developing new net revenue streams, making new lines of business, and making new decisions to continuously improve ADP's portfolio.

19.     Levin conducted research on strategic business issues affecting ADP and led regular, strategic discussions with the CEO and executive committee to promote the transfer of strategic ideas to operational decisions.

20.     Levin acted as a key advisor, business partner, and confidant to the CEO and executive committee of ADP by developing and implementing sound strategic planning, formulating projects, developing hypotheses, advising as to financial and business modeling, identifying strategic options, building consensus, and identifying methods of plan implementation.

21.     Levin had direct contact with and met with ADP clients, market analysts, investors and acquisition targets.

22.     Levin was responsible for ADP's mergers and acquisitions where he would research and target opportunities for business partnerships and acquisitions of other entities.  Levin also analyzed these opportunities to determine what would benefit ADP's strategic growth initiatives by deciding whether it would better serve ADP to acquire a company for specific purposes, i.e., for its clients, technology, and talent, or when it would be more beneficial for ADP to grow or build upon the resources in these areas that it already has.  Levin would then assist the CEO and executive committee in evaluating the opportunities for expansion while ensuring that human capital management needs are considered in these decisions.

23.     Levin was responsible for ADP's investment in innovative internal and external product concepts and was in charge of the ADP Research Institute.  In this capacity, Levin helped to develop, identify, and build out innovative internal and external product concepts for ADP.

24.     Levin had extensive access to the ADP Board of Directors, and was responsible for leading the strategy planning for ADP each year from October through April, which would include meetings with the leaders of each ADP business unit and culminate in a presentation to the ADP Board of Directors in April.

25.     Levin led the most recent Board of Directors presentation on April 6, 2021.

26.     Levin supported ADP's shift from a sales and service company to an innovative technology company with great service, without losing its core values or capabilities.  Levin took an active role in influencing more tenured ADP employees to embrace this new strategy.

27.     As CSO, ADP provided Levin with a significant amount of information about ADP and its products and services, in addition to the unique information he received about ADP's enterprise strategy, business plans, and marketing and sales strategies.  That information includes such things as: the strengths and weaknesses of ADP's products and services; the strengths and weaknesses of ADP's sales strategies; the manner in which ADP sells its products and services; the way ADP differentiates its products and services from its competitors; the strengths and weaknesses of ADP's competitors; the relative advantages and disadvantages between ADP's products and services and those of its competitors; ADP's pricing models and costs; ADP's planned promotions and discounts; ADP's planned

improvements and expected new products and technology; complaints made by ADP's customers; and ADP's merger and acquisition targets. Most of this information is confidential to ADP and should never be disclosed or used by a former employee who goes to a competitor.

28.     In his role as CSO, Levin was exposed to ADP confidential information regarding ADP's enterprise strategy, business plans, and marketing and sales strategies, business relationships, and products.

29.     Levin performed his role as CSO globally, by overseeing all of ADP's Senior Division Vice Presidents ("SDVPs") and Division Vice Presidents ("DVPs") of Strategy and Business Development. With Levin's leadership, ADP's SDVPs and DVPs lead ADP's annual strategic planning process, drive enterprise-wide strategic initiatives, and identify potential alliance partners and acquisition targets across ADP's domestic and global portfolio.

**Levin's RCAs With ADP**

30.     ADP offers participation in a stock award program to senior executives at ADP. ADP conditions the receipt of restricted stock awards, stock option awards, and performance stock unit awards (collectively, "stock awards") on the acceptance by eligible senior executives of restrictive covenants. The stock awards are designed

to be a reward to attract, retain, and motivate ADP employees and to strengthen the mutual interest between the employees and ADP.

31.    ADP offered, and Levin accepted, stock awards on six (6) separate occasions due to his senior executive status at ADP.  In each instance, Levin entered into RCAs with ADP in exchange for the ADP stock awards.  (*See* **Exhibit A**).  In by agreeing to each RCA, Levin agreed to obligate himself to non-competition, non-solicitation, non-disclosure, and non-use restrictive covenants.  (*See id.*).

32.    Most recently, ADP granted Levin the opportunity to accept a performance stock unit award and a stock option award on September 1, 2020 (the "2020 RCAs").  On September 22, 2020, Levin accepted these stock awards in exchange for entering into RCAs with ADP.  (*See* **Exhibit A** at 2020 RCAs, and **Exhibit B**)  The 2020 RCAs include the following pertinent provisions:

**1. Definitions.**

* * *

**d. "Competing Business"** means any individual (including me), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, that part of the Business of ADP in which I have worked or to which I have been exposed during the last two years of my employment with ADP (regardless of whether I worked only for a particular segment of that part of the business in which I worked—for example, business

segments based on the number of employees a Client has or a particular class of business using an ADP product or service).

\* \* \*

**e. "Confidential Information"** means information, or any compilation of information, known or possessed by me because of my employment at ADP that is created, compiled, received, or gathered by ADP or its agents and is related to the Business of ADP, that is valuable to ADP, and which ADP endeavors to protect from disclosure or use by its competitors and others who could benefit from its use, whether in written, tangible, electronic or any other form or media. Assuming the foregoing criteria are met, Confidential Information includes but is not limited to information about: ADP's operations, products, business plans, market strategies, and services; research and development of ADP products and services; ADP's intellectual property and trade secrets; Creative Works, including all publications, products, applications, processes, and software in any stage of development; names and other listings of current or prospective Clients, Business Partners, and Vendors (including contact information that may be compiled in computer databases that are not owned or controlled by ADP such as address books, personal digital assistants, smart phones, cloud storage services, and social and business websites); proposals made to current or prospective Clients, Business Partners, and Vendors or other information contained in offers or proposals to such Clients, Business Partners, and Vendors; the terms of any arrangements or agreements with Clients, Business Partners, and Vendors, including the amounts paid for such services or how pricing was developed by ADP, the implementation of Client specific projects, the identity of Business Partners and Vendors, and Business Partner and Vendor pricing information, the composition or description of future services that are or may be provided by ADP; ADP's financial, marketing, and sales information; technical expertise and know-how developed by ADP, including the unique manner in which ADP conducts its business; employee lists, employee capabilities, confidential personnel information, prospective employee information, and employee training information and practices; Personally Identifiable Information; and Protected Health Information. Confidential Information also includes any information

disclosed to ADP by a third party (including, without limitation, current or prospective Clients, Business Partners, and Vendors) that ADP is obliged to treat as confidential. Confidential Information does not need to be marked in any way to identify it as Confidential Information and does not lose its status as Confidential Information because similar information may be so marked while other Confidential Information is not. This definition of Confidential Information excludes information that is or becomes known or generally available in the public domain through lawful means, other than through my act or failure to act. This definition of Confidential Information and the use of the term Confidential Information in this Agreement are not meant to limit ADP's rights under applicable trade secrets laws, and ADP specifically reserves all of its rights under all applicable laws concerning trade secrets.

\* \* \*

**4. Non-Competition.** I agree that during my employment and for a period of twelve (12) months from the voluntary or involuntary termination of my employment for any reason or no reason, and with or without cause or for no cause, I will not, directly or indirectly, own, manage, operate, join, control, finance, be employed by or with, or participate in any manner with a Competing Business where I (i) will provide the same or similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use, disclose or disseminate ADP's Confidential Information or trade secrets. However, after the voluntary or involuntary termination of my employment for any reason and with or without cause, nothing shall prevent me from owning, as an inactive investor, securities of any competitor of ADP which is listed on a national securities exchange.

\* \* \*

**7. Non-Disclosure and Non-Use of Confidential Information and Trade Secrets.** During my employment, except as authorized and required to perform my duties for ADP, and after the voluntary or involuntary termination of my employment for any reason or no reason, and with or without cause or for no cause, I will not access, disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information or trade secrets or take any action causing, or

fail to take any action necessary in order to prevent, any such information to lose its character or cease to qualify as Confidential Information or a trade secret. I agree to inquire with ADP if I have any questions about whether I am authorized or required to access, disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information or whether particular information is Confidential Information or a trade secret before accessing, using or disclosing such information. I also agree to immediately return to ADP all property and information belonging to ADP such as keys, credit cards, telephones, tools, equipment, computers, passwords, access codes, pin numbers, and electronic storage devices, as well as all originals, copies, or other physical embodiments of ADP's Confidential Information or trade secrets (regardless of whether it is in paper, electronic, or other form), including any such information in any programs, business forms, manuals, correspondence, files, databases, or on computer disks or any other storage medium, including but not limited to cloud storage, whether or not owned or controlled by me or ADP (e.g., social and business networking websites, web-based email servers, Notability, or cloud storage services), immediately upon termination of my employment or upon any earlier request by ADP, and I agree not to keep, access, disclose, use, reproduce, distribute, or otherwise disseminate any copies, electronic or otherwise, of any of the foregoing. I also understand that my obligations under this paragraph, as well as the other covenants in this Agreement, extend to my activities on the internet, including my use of business oriented social networking sites such as LinkedIn and Facebook. This shall include deleting any business related connections or contacts, including all ADP Clients and Business Partners, that I inputted in or with whom I connected on any business oriented social networking sites, my LinkedIn account, any cloud storage, any electronic device, or any cell phones while employed at ADP.

I understand that nothing in this Agreement is intended to prohibit any non-supervisory employee's right to discuss wages, terms and conditions of employment, or other conduct protected by Section 7 of the National Labor Relations Act.

Pursuant to 18 U.S.C. § 1833(b), and as set forth fully therein, notice is hereby given that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a

trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

I understand that nothing in this Agreement prohibits me from reporting possible violations of state or federal law or regulation to any governmental agency or entity or from communicating with any such agency or entity regarding the same or otherwise participate in any investigation or proceeding that may be conducted by any government agency, including providing documents or other information, without notice to ADP. This Agreement does not limit my right to receive an award for information provided to any government agencies. I understand that nothing in this Agreement shall have the purpose or effect of concealing details related to a claim of discrimination, retaliation, or harassment.

*\*\**

**10. Choice of Law, Venue, and Jurisdiction.**  To the extent permitted by the law of the state in which I reside, the interpretation, validity, and enforcement of this Agreement will be governed by the laws of the State of New Jersey, without regard to any conflicts of law principles. I agree that, to the extent permitted by the law of the state in which I reside, any action by me to challenge the enforceability of this Agreement must be brought or litigated exclusively in the appropriate state or federal court located in the State of New Jersey. I also agree that any action by ADP to enforce this Agreement, as well as any related disputes or litigation related to this Agreement may be brought in the appropriate state or federal court located in the State of New Jersey. I agree and consent to the personal jurisdiction and venue of the federal or state courts of New Jersey for resolution of any disputes or litigation arising under or in connection with this Agreement or any

challenge to this Agreement and waive any objections or defenses to personal jurisdiction or venue in any such proceeding before any such court.

\* \* \*

**12. Relief, Remedies, and Enforcement.**  I acknowledge that ADP is engaged in a highly competitive business, and the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect ADP's legitimate business interests, including ADP goodwill and client relations, Confidential Information and trade secrets, and the specialized skills and knowledge gained by me and ADP's other employees during our employment. I acknowledge and agree that a breach of any provision of this Agreement by me will cause serious and irreparable damage to ADP that will be difficult to quantify and for which a remedy at law for monetary damages alone may not be adequate. Accordingly, I agree that if ADP should bring an action to enforce its rights under this Agreement and ADP establishes that I have breached or threatened to breach any of my obligations under this Agreement, ADP shall be entitled, in addition to all remedies otherwise available in law or in equity, to a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining such breach or threatened breach in any court of competent jurisdiction without the necessity of posting a surety bond, as well as an equitable accounting of all profits or benefits arising out of any violation of this Agreement. I also agree that nothing in this Agreement shall be construed to prohibit ADP from pursuing any and all other legal or equitable remedies available to it for breach of any of the provisions of this Agreement, including the disgorgement of any profits, bonuses, commissions, or fees realized by me, any subsequent employers, any business owned or operated by me or to which I provide services, or any of my agents, heirs, or assigns. I also agree that that the knowledge, skills, and abilities I possess at the time of commencement of my employment are sufficient to permit me to earn a livelihood satisfactory to me without violating any provision of paragraphs four (4) through seven (7) above, for example, by using such knowledge, skills, and abilities, or some of them, in the service of business that is not competitive with ADP. I further agree to pay any and all legal fees, including without limitation, all attorneys' fees, court costs, and any

other related fees and/or costs incurred by ADP in enforcing this Agreement.

**13. Tolling.** The restricted time periods in paragraphs four (4) through six (6) above shall be tolled during any time period that I am in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain. This tolling shall include any time period during which litigation is pending, but during which I have continued to violate such protective covenants.

* * *

**16. Electronic Signature.** I agree that ADP may enforce this Agreement with a copy for which I have provided an electronic signature. I agree that my electronic signature, including my acceptance of this agreement via a website is, is a valid signature by me.

* * *

**20. Opportunity to Review.** I agree that I have read this Agreement before signing it, understand its terms, and that I have had the opportunity to have legal counsel review this Agreement, prior to signing it, and I acknowledge that I have not been forced or coerced in any manner to sign this Agreement and do so of my own free will.

(*See* **Exhibit A**, 2020 RCAs, ¶¶ 1(d), 1(e), 4, 7, 10, 12, 13, 16, and 20.)

## Information Provided to Levin by ADP

33.    Throughout the course of his employment with ADP, Levin gained substantial knowledge concerning ADP's enterprise strategy, business plans, marketing and sales strategies, prospective and current clients, business partners, vendors, industry leaders, products and ADP's competitors.

34.     Throughout the course of his employment with ADP, Levin had access to and possession of, and used on a regular basis, ADP's confidential, proprietary, and trade secret information, described above as (the "Proprietary Information").

35.     The Proprietary Information derives independent economic value from not being generally known to, and being readily ascertainable by proper means by, competitors or others who can obtain economic value from its disclosure or use.

36.     ADP has taken reasonable steps to maintain the secrecy of the Proprietary Information.  Such efforts include, among other things, requiring employees to enter into restrictive covenant agreements such as those entered into by Levin.  ADP also, among other things, provides employees with access to Proprietary Information on a need-to-know basis, requires security and password protection on its work locations and systems, and reminds and trains its employees about the sensitive nature of this information.

## Levin's Wrongful Conduct

37.     Benefitfocus creates data-driven, cloud-based software solutions for health care and benefits administration for its employer-clients.  Benefitfocus' web-based platforms use artificial intelligence tools to target employee preferences, provide a communication service for employees to use regarding their benefits, manage data, and monitor legal compliance.

38.     ADP also offers custom web-based platforms for benefit administration services to its employer-clients.   ADP's web-based platforms also use artificial intelligence tools to target employee preferences, provide a communication service for employees to use regarding their benefits, manage data, and monitor legal compliance.

39.     Benefitfocus is a direct competitor of ADP.

40.     Levin is aware that Benefitfocus is, and has been identified as, a direct competitor of ADP due to his involvement with ADP's competitive intelligence team and understanding of ADP's competitors in the benefits administration space. Indeed, Levin advises ADP's executive committee and CEO as to strategy with respect to going head to head against ADP's competitors.

41.     In January 2021, Levin informed ADP that he was planning to take a job as the CEO of Benefitfocus.

42.     ADP informed Levin that Benefitfocus was a competitor of ADP and that ADP would consider his taking the job a violation of the RCAs.

43.     Levin eventually decided to stay at ADP.

44.     On April 28, 2021, Levin resigned from his employment with ADP.

45.     On the evening of April 28, 2021, Levin called Sreeni Kutam, Chief Human Resources Officer of ADP, to inform him of his decision to leave ADP.

While Levin said he had not yet signed an offer, he told Kutam his plan was to join Benefitfocus.

46.    Levin stated that he would not have made the decision to leave ADP except for Benefitfocus' offer to indemnify him if ADP pursued a lawsuit against him.

47.    Levin told Kutam that taking the job as CEO of Benefitfocus was the right decision for him because the economic package was going to be life changing.

48.    On May 1, 2021, ADP sent a letter reminding Levin not to violate his RCAs with ADP and requesting that Levin confirm or deny in writing whether he has accepted or intends to accept employment as the CEO of Benefitfocus, or any employment, at Benefitfocus.   (*See* May 1, 2021 Reminder Letter, attached as **Exhibit B**.)

49.    ADP warned Levin that if it did not receive a response from him by May 2, 2021 at 5:00 pm, ADP would act in reliance on his statement made to Sreeni Kutam regarding accepting a position as CEO of Benefitfocus and take action to protect ADP's interests under the RCAs.

50.    On May 2, 2021, counsel for Levin and Benefitfocus provided to counsel for ADP a letter that had purportedly been sent to ADP on April 29, 2021. *See* April 29, 2021 letter, attached as **Exhibit C**).   In the letter, counsel for Levin

and Benefitfocus explained why they did not believe Levin taking the  position of Benefitfocus CEO was a violation of Levin's RCAs.

51.    Levin and Benefitfocus have taken the remarkable positions that (1) ADP and Benefitfocus are not competitors and (2) the roles of CSO at ADP and CEO at Benefitfocus are not the same or similar.   As described in this Complaint, the only person at ADP who had more exposure to ADP as a whole or played a more significant role on the overall strategy of the company is ADP's CEO.

52.    Levin has not otherwise responded to ADP's letter.

53.    Upon information and belief, Levin has or will accept a position with Benefitfocus, ADP's direct competitor, in violation of the RCAs.

54.    Upon information and belief, Levin will be employed as Benefitfocus' CEO.

55.    Upon information and belief, at Benefitfocus Levin is in a role that is substantially similar to the role he held as CSO for ADP.

56.    At the ADP, the CSO role is broad and varied, and in many respects overlaps with the role of the CEO.  Upon information and belief, as CEO of Benefitfocus Levin will provide the same or similar services as those that he provided to ADP as CSO, including at least: developing short-term, mid-term, and long-term strategy for Benefitfocus; working with Benefitfocus' various business

units to drive growth and achieve goals; and positively influence the trajectory of Benefitfocus' performance.

57.     Because Levin is working for, or plans to work for, a direct competitor of ADP, Levin either has used or disclosed or inevitably will use and disclose ADP's Proprietary Information for the benefit of Benefitfocus and to the detriment of ADP. Levin will not be able to separate the knowledge he gained as CSO of ADP from the his new position as CEO of Benefitfocus.

58.     Levin's employment at Benefitfocus in this role is expressly forbidden by his non-compete obligations set forth in the RCAs.

59.     Levin's conduct constitutes a violation of the RCAs.

60.     Levin's conduct constitutes unfair competition, breach of the duty of loyalty, and a breach of his RCAs with ADP.

## Irreparable Harm to ADP

61.     Upon information and belief, Levin's conduct is unfairly harming ADP's business.  The harm is irreparable.

62.     If Levin's conduct is not enjoined, Levin will continue to impermissibly compete and to disclose or use, or inevitably disclose or use, ADP's Proprietary Information to ADP's competitive disadvantage.  Aspects of ADP's enterprise strategy, business plans, and sales and marketing strategy will be shared with Benefitfocus, ADP will lose clients and prospective clients, employees, vendors, and

marketing partners.  Furthermore, ADP will lose goodwill and the referral business of its clients and marketing partners, as well as revenues in an amount that cannot be readily ascertained.

63.    Upon information and belief, as a direct result of Levin's actions, ADP will lose the value of its Proprietary Information.  Such information was developed and maintained at great expense and effort on the part of ADP and belongs to ADP. The ADP Proprietary Information that Levin obtained and learned while employed at ADP will aid Levin in his employment with Benefitfocus, a competitor of ADP.

64.    Benefitfocus will benefit from Levin's knowledge of ADP's Proprietary Information that Levin will inevitably use at Benefitfocus in his role as CEO.

65.    Unless enjoined, Levin will breach or continue to breach the RCAs and his legal duties and obligations by working at Benefitfocus, disclosing ADP's Proprietary Information, and misusing ADP's Proprietary Information to his and Benefitfocus' advantage and to the competitive disadvantage of ADP.

66.    If Levin is not immediately barred from violating the RCAs and from using and disclosing ADP's Proprietary Information, ADP will continue to suffer irreparable harm.  ADP lacks an adequate remedy at law to address the harm that it is suffering as a result of Levin's actions.  Indeed, as noted above, Levin agreed that

any violation of the RCAs would irreparably harm ADP and therefore would entitle ADP to injunctive relief to prevent further damage to ADP.

67.    Due to Levin's disclosure and/or inevitable disclosure of ADP's Proprietary Information, as well as the loss of ADP's competitive edge, client goodwill, and competition, ADP is entitled to temporary, preliminary, and permanent injunctive relief barring Levin from violating his nondisclosure, non-competition, and non-solicitation obligations and from continuing to unfairly compete against ADP and wrongfully use and disclose its Proprietary Information, as set forth more fully below.  ADP is also entitled to damages, including lost profits, interest, costs, and attorneys' fees.

68.    By ignoring and disavowing his obligations under the clear restrictive covenants contained in the RCAs, Levin's breaches of the RCAs constitute the type of willful, fraudulent, and malicious conduct that warrant punitive damages.

### Count I
### Declaratory Judgment Pursuant to 28 U.S.C. § 2201

69.    The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

70.    The RCAs are valid and binding contracts between ADP and Levin, supported by valid consideration and sufficiently definite terms.

71.    Pursuant to Section 4 of the 2020 RCAs, Levin agreed to the following non-competition provision: "I agree that during my employment and for a period of

twelve (12) months from the voluntary or involuntary termination of my employment for any reason or no reason, and with or without cause or for no cause, I will not, directly or indirectly, own, manage, operate, join, control, finance, be employed by or with, or participate in any manner with a Competing Business where I (i) will provide the same or similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use, disclose or disseminate ADP's Confidential Information or trade secrets."

72.    A "Competing Business" of ADP is defined under the 2020 RCAs as "any individual (including [Levin]), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, that part of the Business of ADP in which [Levin has] worked or to which [Levin has] been exposed during the last two years of [Levin's] employment with ADP (regardless of whether [Levin] worked only for a particular segment of that part of the business in which [Levin] worked—for example, business segments based on the number of employees a Client has or a particular class of business using an ADP product or service)."

73.    An actual controversy exists between ADP and Levin as to whether Levin has or will breach his non-compete and non-disclosure obligations to ADP under the RCAs by accepting a position as CEO of Benefitfocus.

74.    ADP has informed Levin that Benefitfocus is a direct competitor of ADP and that accepting a position as the CEO of Benefitfocus is in violation of the RCAs.

75.    Levin has failed to confirm to ADP that he has not and will not accept a position with Benefitfocus as its CEO.

76.    The actual controversy between ADP and Levin is evidenced by the letter ADP received from counsel for Levin and Benefitfocus, attached hereto as **Exhibit C**.

77.    The controversy between ADP and Levin is real and adverse.  ADP's interests are directly adverse to Levin's interests.

78.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, ADP seeks a declaratory judgment that accepting a position as CEO of Benefitfocus constitutes a breach of the RCAs because: (i) Benefitfocus is a "Competing Business" of ADP as defined under the RCAs; (ii) Levin will provide the same or similar services to a Competing Business, i.e., Benefitfocus, as those which Levin provided to ADP while employed as CSO; and (iii) Levin will use, disclose or disseminate ADP's Confidential Information or trade secrets in his role as CEO of Benefitfocus.

## Count II
## Breach of Contract

79.     The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

80.     Levin voluntarily entered into the RCAs with ADP.

81.     The RCAs are each valid, binding, and enforceable contracts.

82.     The RCAs are each supported by adequate legal consideration.

83.     ADP fully performed as required under the RCAs.

84.     Levin breached the RCAs by engaging in the conduct described herein, including working for Benefitfocus in a similar position that requires the use or disclose ADP Proprietary Information.

85.     As a result of Levin's breaches, ADP has suffered damages.

86.     As a result of Levin's breaches, ADP has suffered irreparable injury, and ADP will continue to suffer irreparable injury for which there is no adequate remedy at law.

87.     ADP is entitled to damages, costs, and disbursements incurred in this action, including attorneys' fees, punitive damages, and to temporary, preliminary, and permanent injunctive relief against further breaches of the RCAs.

**Count III**
**Breach of the Duty of Loyalty**

88.     The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

89.     As an employee of ADP, Levin owed his employer an undivided duty of loyalty including, but not limited to, the duty to advance the interests of ADP, the duty to preserve ADP's Proprietary Information, and the duty not to use any of ADP's Proprietary Information in any way adverse to ADP's interests.

90.     Following his separation from ADP, Levin continues to owe a duty to ADP not to make use of its Proprietary Information.

91.     Upon information and belief, Levin breached his duty of loyalty to ADP by obtaining ADP's Proprietary Information with full knowledge he would be resigning to join Benefitfocus, where he will use or disclose ADP's Proprietary Information, and through his work for Benefitfocus, a direct competitor of ADP, in contravention of the RCAs.

92.     Levin's breaches of the RCAs have wrongfully benefitted both Levin and Benefitfocus, which, in turn, have caused ADP to suffer damages.

93.     As a result of Levin's breaches, ADP has suffered irreparable injury, and ADP will suffer further irreparable injury for which there is no adequate remedy at law.

94.     ADP is entitled to damages, costs and temporary, preliminary, and permanent injunctive relief against further breaches of the RCAs by Levin.

## Count IV
## Unfair Competition

95.     The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

96.     Levin's aforementioned unlawful behavior constitutes unfair competition.

97.     Levin's conduct was undertaken with the intent to interfere with and disrupt ADP's business.

98.     Levin's acts have resulted in and continue to result in Levin's and Benefitfocus' wrongfully procured competitive advantage to the competitive disadvantage of ADP.

99.     Levin's actions are intentional, malicious, and unjustified in law.

100.    As a proximate result of Levin's actions and conduct amounting to unfair competition, ADP has been and will continue to be irreparably injured, including, but not limited to, the loss of its competitive edge, client goodwill, and ADP's Proprietary Information.

101.    Unless temporarily, preliminarily, and permanently restrained, Levin will continue to violate ADP's rights through his unfair competition.  Accordingly, a temporary, preliminary, and permanent injunction restraining and enjoining Levin from continuing his actions is the only remedy that will afford ADP meaningful relief.

102.   Due to Levin's unfair competition, the misuse and disclosure of ADP's Proprietary Information, as well as a loss of ADP's competitive advantage and client goodwill, ADP is entitled to temporary, preliminary, and permanent injunctive relief as well as damages, including, but not limited to, punitive damages, lost profits, inclusive of interest, costs and attorneys' fees.

## Count V
## Violation of the Defend Trade Secrets Act

103.   The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

104.   ADP's trade secrets, as set forth in the foregoing paragraphs, are statutory "trade secrets" protected by the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1839.

105.   ADP's trade secrets are sufficiently secret to derive economic value because they are not generally known to and are not readily ascertainable through proper means by other persons who can obtain economic value from their disclosure or use.

106.   At all times, ADP has taken reasonable measures to protect the secrecy and confidentiality of ADP's trade secrets.

107. Upon information and belief, Levin misappropriated ADP's trade secrets through improper disclosure and/or use without ADP's express or implied consent.

108. Upon information and belief, Levin continues to maintain and use ADP's trade secrets without ADP's express or implied consent.

109. Upon information and belief, Levin intentionally misappropriated ADP's trade secrets, by among other things: (a) breaching his obligation to not disclose ADP's Proprietary Information and trade secrets; (b) improperly using the information in an effort to harm ADP's goodwill and to secure lucrative customer contracts with current or prospective ADP customers; and (c) improperly disclosing the information to Benefitfocus for use in competition with ADP.

110. The trade secret information misappropriated by Levin is related to ADP's enterprise strategy, business plans, and sales and marketing strategy concerning the sales of ADP's products and services that are used in, and intended for use in, interstate or foreign commerce.

111. There is a genuine, imminent threat that Levin will continue to disclose or use ADP's trade secrets in the course of his employment with Benefitfocus.

112. ADP has suffered and will continue to suffer damages, including, but not limited to, actual loss and unjust enrichment by Levin and Benefitfocus, in an

amount to be proven at trial, as a direct result of Levin's threatened or actual misappropriation of ADP's trade secrets.

113.   Levin's actual or threatened misappropriation of ADP's trade secrets has been willful and malicious and entitles ADP to exemplary damages and an award of attorneys' fees and costs pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3).

114.   ADP is also entitled to injunctive relief to prevent the threatened or actual misappropriation of ADP's trade secrets by Levin pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3).   Levin's misappropriation has caused and will cause ADP to suffer substantial and irreparable harm unless Levin is immediately restrained and enjoined from retaining and using ADP's trade secrets.

## Count VI
## Misappropriation of Trade Secrets, N.J.S.A. 56:15-2 to -3

115.   The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

116.   A confidential relationship existed between ADP and Levin as a result of his execution of the RCAs which contained non-competition, non-solicitation, and non-disclosure provisions.

117.   ADP's confidential and proprietary business information qualifies for trade secret protection under New Jersey law.  ADP's business information derives independent economic value and gives ADP an advantage over its competitors

because this information is not generally known to Benefitfocus or others in the industry, and because it is not easily acquired through proper means by ADP's competitors or by others in the industry.

118.  ADP has invested substantial time and money in developing these trade secrets, and ADP has taken and continues to take reasonable measures to protect and preserve the secrecy of its trade secrets.  Access to ADP's trade secrets is given to ADP employees only to the extent required by their positions and only upon their execution of agreements similar to the RCAs executed by Levin.

119.  Upon information and belief, Levin misappropriated ADP's trade secrets by using or disclosing them to Benefitfocus for his own benefit.

120.  Upon information and belief, Levin used or disclosed ADP's trade secrets and Proprietary Information relating to ADP's strategic business plans, products, services, sales force, clients and prospective clients.

121.  ADP has suffered and will continue to suffer irreparable harm and damages as a direct and proximate result of the misappropriation of its trade secrets and other confidential information by Levin, for which it is entitled to recover damages and immediate temporary, preliminary, and permanent injunctive relief against Levin pursuant to the New Jersey Trade Secrets Act, N.J.S.A. §§ 56:15-1, *et seq*.

122.   Levin's conduct as alleged in this Complaint has been willful and malicious.  Accordingly, in addition to its actual damages, ADP is entitled to recover exemplary damages and its attorneys' fees, pursuant to N.J.S.A. §§ 56:15-4-6.

## REQUESTS FOR RELIEF

**WHEREFORE**, ADP respectfully requests:

A.   That this Court enter temporary, preliminary, and permanent injunctions restraining and enjoining Levin from directly or indirectly undertaking the following activities:

(i)   Working or performing substantially similar services for any competitor of ADP, including, without limitation, Benefitfocus for a period of twelve (12) months from the date of entry of an Order granting ADP injunctive relief;

(ii)   Violating the terms and conditions of the RCAs with ADP;

(iii)   Using or disclosing at any time in the future, ADP's confidential, proprietary, or trade secret business information or property;

(iv)   Interfering in any way with any current contract, client relationship, prospective client relationship, or marketing partner relationship of ADP; and

(v)   Breaching any loyalty obligation to ADP, including, but not limited to, appropriating any business opportunity of ADP, engaging in deceptive acts or statements with regard to ADP's abilities, experiences, and personnel, and from otherwise attempting to gain unfair advantage against ADP;

B.     That this Court declare that Benefitfocus is a Competing Business of ADP, as defined in the RCAs, and that the positon of Chief Executive Officer of Benefitfocus is similar to the position of Chief Strategy Officer that Levin held at ADP, and that Levin taking the position of CEO at Benefitfocus is a violation of Section 4 of Levin's RCAs.

C.     That ADP be granted monetary damages, including, but not limited to, exemplary and punitive damages, lost profits, costs associated with Levin breaching the RCAs and duty of loyalty to ADP, unfair competition, and misappropriation of ADP's trade secrets, and all other appropriate damages, as well as all interest, costs and disbursements of this action, including attorneys' fees, as contractually agreed upon, and such other and further relief and this Court may deem just and proper.

Dated:  May 3, 2021

Respectfully submitted,

/s/ Harris S. Freier
**GENOVA BURNS LLC**
Harris S. Freier, Esq. (NJ Bar #013412006)
HFreier@genovaburns.com
494 Broad Street
Newark, New Jersey 07102
Telephone: (973) 533-0777
Facsimile: (973) 533-1112
*Attorneys for Plaintiff, ADP, Inc.*

**MCDONALD HOPKINS PLC**
Timothy J. Lowe, Esq. (MI Bar # P68669)
tlowe@mcdonaldhopkins.com
39533 Woodward Avenue, Suite 318

Bloomfield Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-7075
*Co-Counsel for Plaintiff, ADP, Inc.*
(To Be Admitted *Pro Hac Vice*)

## **CERTIFICATION**

Pursuant to Local Civil Rule 11.1, the undersigned hereby certifies that the matters raised herein are not the subject of any other pending lawsuit, arbitration, or administrative proceeding pending in any court:

Dated: May 3, 2021

Respectfully submitted,

/s/ Harris S. Freier
**GENOVA BURNS LLC**
Harris S. Freier, Esq. (NJ Bar #013412006)
HFreier@genovaburns.com
494 Broad Street
Newark, New Jersey 07102
Telephone: (973) 533-0777
Facsimile: (973) 533-1112
*Attorneys for Plaintiff, ADP, Inc.*

**MCDONALD HOPKINS PLC**
Timothy J. Lowe, Esq. (MI Bar # P68669)
tlowe@mcdonaldhopkins.com
39533 Woodward Avenue, Suite 318
Bloomfield Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-7075
*Co-Counsel for Plaintiff, ADP, Inc.*
(To Be Admitted *Pro Hac Vice*)